**No. 23-5053**

# In the
# United States Court of Appeals
## for the Sixth Circuit

AMERICAN COLLEGE OF PEDIATRICIANS, on behalf of its members;
CATHOLIC MEDICAL ASSOCIATION, on behalf of its members,

*Plaintiffs-Appellants,*

v.

XAVIER BECERRA, in his official capacity as Secretary of the
United States Department of Health and Human Services;
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
OFFICE FOR CIVIL RIGHTS OF THE U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; LISA J. PINO, in her official capacity as Director of the
Office for Civil Rights of the U.S. Department of Health and Human Services

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga, No. 1:21-cv-00195.
The Honorable **Travis Randall McDonough**, Chief District Judge Presiding.

## BRIEF OF THE CENTER FOR AMERICAN LIBERTY AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

GARY M. LAWKOWSKI
Bar No. 1207310
DHILLON LAW GROUP, INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
(703) 574-1654
GLawkowski@DhillonLaw.com

*Counsel for Amicus Curiae
Center for American Liberty*

 

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-5053          Case Name: Am. Coll. of Pediatricians v. Becerra

Name of counsel: Gary M. Lawkowski

Pursuant to 6th Cir. R. 26.1, Center for American Liberty

*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

### CERTIFICATE OF SERVICE

I certify that on _____ April 6, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Gary M. Lawkowski

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT OF INTEREST..................................................................1

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................3

I.   *McKay's* Factors are Not a Test and are Non-Exhaustive.............................4

II.  A Reasonable First Amendment Chill is Sufficient to Establish Standing .....6

III. Appellees Have Not Disavowed Enforcing Section 1557 .............................9

    A.   Appellants are Not Required to Break the Law and See What Happens to Establish Standing............................................................10

    B.   Generic Assurances that Government Agencies Will Not Break the Law Are Not a Repudiation of an Intent to Enforce Against Specific Plaintiffs ............................................................................11

    C.   The District Court's Reliance on Appellees' RFRA Statements Disregard Appellant's Constitutional Claims ....................................13

    D.   The District Court's Approach to Standing Would Functionally Eviscerate the Declaratory Judgment Act ...........................................13

IV.  There is a Citizen Enforcement Provision for Section 1557 .......................15

    A.   Standing Analysis Focuses on Citizen *Initiated* Enforcement, Not Citizen Driven *Prosecution* of Enforcement Actions ........................16

    B.   A Lengthy Administrative Enforcement Process is a Harm, Not a Benefit ............................................................................17

    C.   Administrative Agencies are the Wrong Forum for Adjudicating Constitutional Rights.........................................................18

CONCLUSION ...................................................................................21

# TABLE OF AUTHORITIES

*Abbott Laboratories v. Gardner*,
  387 U.S. 136 (1967) ........................................................................ 13-14

*American College of Pediatricians v. Becerra*,
  No. 1:21-cv-195, 2022 WL 17084365 (E.D. Tenn. Nov. 18, 2022) ...........*passim*

*Arnett v. Kennedy*,
  416 U.S. 134 (1974) ................................................................................6

*Axon Enterprise, Inc. v. F.T.C.*,
  986 F.3d 1173 (9th Cir. 2021), *certiorari granted in part*,
  142 S. Ct. 895 (2022) .............................................................................14

*Berry v. Schmitt*,
  688 F.3d 290 (6th Cir. 2012) ...................................................................7

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) ................................................................................8

*Carey v. Wolnitzek*,
  614 F.3d 189 (6th Cir. 2010) ...............................................................7, 8

*Citizens United v. F.E.C.*,
  558 U.S. 310 (2010) .............................................................................6, 13

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) .............................................................................3, 20

*Clapper v. Amnesty International USA*,
  568 U.S. 398 (2013) ................................................................................5

*Cochran v. S.E.C.*,
  969 F.3d 507 (5th Cir. 2020), *certiorari granted*,
  142 S. Ct. 2707 (2022) ........................................................................ 14-15

*Collins v. Yellen*,
  141 S. Ct. 1761 (2021) ..........................................................................19

*Connally v. General Constr. Co.*,
  269 U.S. 385 (1926) ................................................................................6

*Crowell v. Benson*,
  285 U.S. 22 (1932) ................................................................................................20

*Davis v. Colerain Twp.*,
  51 F.4th 164 (6th Cir. 2022) ...............................................................................7

*Dep't of Transp. v. Ass'n of Am. R.Rs.*,
  575 U.S. 43 (2015) ...............................................................................................19

*Doster v. Kendall*,
  54 F.4th 398 (6th Cir. 2022) ...............................................................................8

*F.E.C. v. Cruz*,
  142 S. Ct. 1638 (2022) ........................................................................................10

*Fischer v. Thomas*,
  52 F.4th 303 (6th Cir. 2022) .........................................................................*passim*

*Franciscan Alliance, Inc. v. Becerra*,
  47 F.4th 368 (5th Cir. 2022) ...................................................................6, 10, 12

*GPM Southeast LLC v. Riiser Fuels LLC*,
  No. 21-cv-554, 2022 WL 17821219 (E.D. Wisc. Dec. 20, 2022); .....................10

*Hill v. S.E.C.*,
  825 F.3d 1236 (11th Cir. 2016) ..........................................................................14

*Kiser v. Reitz*,
  765 F.3d 601 (6th Cir. 2014) ...............................................................................8

*Kisor v. Wilke*,
  139 S. Ct. 2400 (2019) ...........................................................................................3

*McKay v. Federspiel*,
  823 F.3d 862 (6th Cir. 2016) .........................................................................*passim*

*Marbury v. Madison*,
  1 Cranch 137 (1803) ........................................................................................2, 20

*MedImmune, Inc. v. Genetech, Inc.*,
  549 U.S. 118 (2007) .............................................................................................11

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*,
  458 U.S. 50 (1982) ...............................................................................................20

*Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*,
477 U.S. 619 (1986)................................................................5

*Online Merchants Guild v. Cameron*,
995 F.3d 540 (6th Cir. 2021) ...............................................4

*Religious Sisters of Mercy v. Becerra*,
55 F.4th 583 (8th Cir. 2022) ....................................6, 10, 12

*Sackett v. Envtl. Prot. Agency*,
566 U.S. 120 (2012)................................................................4

*Steffel v. Thompson*,
415 U.S. 452 (1974)..............................................................10

*Stern v. Marshall*,
564 U.S. 462 (2011)..............................................................19

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014).......................................................*passim*

*Winter v. Wolnitzek*,
834 F.3d 681 (6th Cir. 2016) ................................................8

## Rules, Statutes and Other Authority

28 U.S.C. § 2201 ..................................................................13

45 C.F.R. § 80.7(b) ..............................................................15

Alexander Hamilton, The Federalist No. 78 (May 28, 1788)...................................19

Brief of Citizens United and Citizens United Foundation as *Amici Curiae* in
Support of Respondent, *S.E.C. v. Cochran*, Docket No. 21-1239
(U.S. July 7, 2022) ..............................................................18

Department of Health and Human Services, *Notification of Interpretation and
Enforcement of Section 1557 of the Affordable Care Act and Title IX of the
Education Amendments of 1972*, 86 Fed. Reg. 27984-02, 27984
(May 25, 2021).....................................................................9

Edwin Borchard, *Challenging 'Penal' Statutes by Declaratory Action*,
52 Yale L. J. 445 (1943) .......................................................14

v

James Madison, The Federalist No. 47 (Feb. 1, 1788) ............................................ 19

James Madison, The Federalist No. 51 (Feb. 6, 1788) ............................................ 12

Joseph P. Fried, *Raymond Donovan, 90, Dies; Labor Secretary Quit Under a Cloud*, N.Y. Times (June 5, 2021) ......................................................... 18

Ohio Rev. Code Ann. § 3517.153(A) ........................................................ 15

Ohio Rev. Code Ann. §§ 3517.154–57 .................................................. 16

## STATEMENT OF INTEREST[1]

The Center for American Liberty (CAL) is a 501(c)(3) non-profit law firm dedicated to protecting free speech and civil liberties for all. CAL represents litigants across the country and has an interest in ensuring that courts apply the correct legal standard applicable to standing requirements in cases involving constitutional rights.

The parties have consented to the filing of this brief.

## INTRODUCTION

This case is about the ability of ordinary citizens to avoid having to choose between "voluntarily" abandoning their constitutional and statutory rights and acting in apparent defiance of a regulatory edict, thus risking being subjected to an economically and reputationally costly enforcement action.

The District Court's decision below closes the courthouse doors to plaintiffs whose conduct falls within the scope of a challenged regulation or enforcement policy, even after the agency expressly stated it intends to enforce its policy and pointedly declined to disavow enforcement.  Worse still, the District Court's decision ignores the threat to fundamental First Amendment rights to speech and the free exercise of religion created by the agency, where even a vague or ambiguous enforcement posture credibly threatens to chill protected activities.

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity, other than amicus curiae or its counsel, contributed money to fund the brief's preparation or submission.

In doing so, the District Court erred.  A reasonable chill on First Amendment activities alone suffices to establish standing.  But even if it did not, Appellees have not disavowed enforcing Section 1557 against Appellants—to the contrary, Appellees have generally threatened enforcement and pointedly refused to make an individualized statement that Appellants' conduct is protected.  Against this backdrop, generic assurances that a government agency will not violate the law are plainly insufficient to deny standing to plaintiffs plausibly alleging otherwise, based on the chill such agency action has on plaintiffs' First Amendment activities.

In addition, Appellants' concerns regarding enforcement are heightened by a citizen-enforcement provision that allows any citizen to file a complaint, meaning that even if Appellees were not a looming threat, Appellants' rights would still be at risk.

Finally, the administrative adjudication process is no substitute for access to the federal courts.  When it comes to administrative enforcement, the process itself is often the punishment.  A lengthy enforcement process enhances, not mitigates, this punishment, particularly considering that administrative agencies are the wrong forum for the adjudication of fundamental constitutional rights.

As Justice Marshall wrote in *Marbury v. Madison*, "[i]t is emphatically the province and duty of the judicial department to say what the law is."  1 Cranch 137, 177 (1803).  It should do so in this case.  Appellants have credibly alleged a

reasonable threat of enforcement.  The judgment of the District Court should be reversed, and Appellants should be permitted to have their day in court.

## ARGUMENT

The District Court's narrow approach to standing would effectively shut the courthouse doors on citizens whose conduct falls within the scope of ever-increasing regulatory edicts, forcing them to choose between "voluntarily" surrendering their rights or persisting and risking serious legal, economic, and reputational consequences.

This approach is inconsistent with Article III.  "[I]n the 21st century, '[t]he administrative state wields vast power and touches almost every aspect of daily life.'"  *Kisor v. Wilke*, 139 S. Ct. 2400, 2446 (2019) (Gorsuch, J., concurring in judgment) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 313 (2013) (Roberts, C.J., dissenting)). Under this paradigm, courts should be particularly cautious before "deny[ing] citizens an impartial judicial hearing on the meaning of disputed regulations." *Id.* at 2447.

Here, the District Court misapplied this Court's precedent and denied Appellants an impartial judicial hearing on the meaning of disputed regulatory interpretations.  But there is nothing in Section 1557 that "was uniquely designed to enable the strong-arming of regulated parties into 'voluntary compliance' without

the opportunity for judicial review." *Sackett v. Envtl. Prot. Agency*, 566 U.S. 120, 130–31 (2012). Appellants have standing.

## I.    *McKay*'s Factors are Not a Test and are Non-Exhaustive

The District Court relied heavily on *McKay v. Federspiel*, 823 F.3d 862 (6th Cir. 2016), in concluding Appellants lack standing. *American College of Pediatricians v. Becerra*, No. 1:21-cv-195, 2022 WL 17084365, *14–16 (E.D. Tenn. Nov. 18, 2022). *McKay* listed four illustrative factors going to whether the plaintiff in that case faced a credible threat of prosecution: "(1) a history of past enforcement against the plaintiffs or others, . . . (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct, . . . (3) an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action, . . . [or (4)] a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." *McKay*, 823 F.3d at 869. These "factors are not exhaustive, nor must each be established." *Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021); *see also Fischer v. Thomas*, 52 F.4th 303, 307–08 (6th Cir. 2022) (per curiam) ("This isn't a laundry list; the [plaintiffs] don't have to satisfy all the factors.").

These factors should be considered within their broader legal context. *McKay* was decided roughly two years after the Supreme Court decided *Susan B. Anthony*

*List v. Driehaus*, 573 U.S. 149 (2014), which had reversed this Court's narrow interpretation of *Clapper v. Amnesty International USA,* 568 U.S. 398 (2013), as substantially limiting the ability of traditional plaintiffs to obtain pre-enforcement review of applicable edicts. To that end, the Supreme Court in *Driehaus* emphasized that "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' *or* there is a 'substantial risk' that the harm will occur.'" 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5) (emphasis added). In *Driehaus*, the Supreme Court further concluded that whether there is a "substantial risk" of enforcement does not require anything like certainty; instead, only a "credibl[e]" threat of enforcement or a "reasonable threat of prosecution" are required. 573 U.S. at 164, 165 (quoting *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 625–26 n.1 (1986)).

Like *McKay*, *Driehaus* also examined a number of factors in making its standing assessment, including the history of past enforcement, the ability of citizens to file complaints, the frequency of enforcement proceedings, and the failure of respondents to disavow enforcement against the petitioners. 573 U.S. at 164–65. The context of the case makes clear that these factors were illustrative based on the facts of the case before the Court; they were not an exhaustive "test" for assessing the credibility or reasonableness of a prosecution threat.

## II.    A Reasonable Chill is Sufficient to Establish Standing under the First Amendment

"[T]he value of a sword of Damocles is that it hangs—not that it drops." *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting).  The Supreme Court has recognized that vague laws chill speech because "[p]eople 'of common intelligence must necessarily guess at [the law's] meaning and differ as to its application.'" *Citizens United v. F.E.C.*, 558 U.S. 310, 324 (2010) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).  The same is true for vague enforcement standards: people of ordinary intelligence must necessarily guess at whether their conduct falls within the scope of what an agency has determined is proscribed. *See generally Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 606 (8th Cir. 2022) ("Although the government maintains that it 'will comply' with [the Religious Freedom Restoration Act ("RFRA")] . . . its promise is 'so vague that the scope of liability [is] both unknown by the [government] and unknowable to [the plaintiffs],' who are 'within the 'class whose [conduct] is arguably restricted.'") (quoting *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 377 (5th Cir. 2022) (alterations in original) (citations omitted)).  This uncertainty has an inherent chilling effect that is sufficient standing alone to establish standing.

This Court's cases on whether and under what circumstances the chilling effect of uncertain enforcement prospects is sufficient are not crystal clear.  For example, *McKay* stated that "without some other indication of imminent

6

enforcement' . . . mere allegations of a 'subjective chill' on protected speech are insufficient to establish an injury-in-fact for pre-enforcement standing purposes." 823 F.3d at 868–69 (quoting *Berry v. Schmitt*, 688 F.3d 290, 296 (6th Cir. 2012)); *see also Davis v. Colerain Twp.*, 51 F.4th 164, 173 (6th Cir. 2022) ("[W]e have repeatedly rejected similar claims that concerns about 'chilling' speech allow us to water down Article III's core constitutional components."). *McKay* went on to note that "a credible threat of prosecution [will exist] where plaintiffs allege a subjective chill *and* point to some combination" of the *McKay* factors. *Id* at 869 (emphasis in original).

More recently, however, *Fischer* stated that "[t]o identify a credible threat of enforcement, the first and most important factor is whether the challenged action chills speech." *Fischer*, 52 F.4th at 307. *Fischer* further emphasized that a plaintiff could establish a "chill" based on "self-censorship" resulting from "vague threats" of enforcement "that could apply to a wide range of" speech. *Id. Fisher* also noted that the *McKay* factors were considered "[b]eyond" the chilling impact, suggesting that a chilling impact itself may be sufficient to establish a credible threat of enforcement. *Id.*

Similarly, in *Carey v. Wolnitzek*, this Court noted that "[i]n the context of a free-speech overbreadth challenge . . . a relaxed ripeness standard applies to steer clear of the risk that the law 'may cause others not before the court to refrain from

7

constitutionally protected speech or expression.'" 614 F.3d 189, 196 (6th Cir. 2010) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)); *see also Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014) (quoting *Carey*, 614 F.3d at 196); *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016) ("The line between Article III standing and ripeness in preenforcement First Amendment challenges has evaporated. . . . 'The doctrines of standing and ripeness originate from the same Article III limitation' and thus are analyzed together in challenges of this sort." (quoting *Driehaus*, 573 U.S. at 157 n.5)).

Finally, in *Doster v. Kendall*, this Court recently emphasized that "[w]hen the government pressures parties to give up intangible rights like those protected by RFRA, courts should not delay review until the time that the parties must rush into court seeking a temporary restraining order to protect these rights." 54 F.4th 398, 418 (6th Cir. 2022) (citations omitted).

This Court should clarify that the reasonable risk of chilling protected speech and religious activities is a separate and sufficient basis to establish standing. Unlike other, more mundane activities, the chilling of protected speech is itself a cognizable harm. While there should be more than a purely "subjective" chill, a *reasonable* fear that an ambiguous enforcement policy will be applied to protected activities should be sufficient to establish a credible threat of prosecution. And there is far more than

just a reasonable fear of an ambiguous enforcement policy underlying Appellants'
claims.

## III. Appellees Have Not Disavowed Enforcing Section 1557

Appellees have not disavowed enforcing Section 1557 against Appellants. To
the contrary, Appellees explicitly threatened to enforce Section 1557 against
regulated persons who engaged in what Appellees consider to be discrimination
based on sexual orientation or gender identity: "[B]egining May 10, 2021, the
Department of Health and Human Services (HHS) will interpret *and enforce* section
1557 of the Affordable Care Act prohibition on discrimination on the basis of sex to
include: Discrimination on the basis of sexual orientation; and discrimination on the
basis of gender identity." Department of Health and Human Services, *Notification
of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and
Title IX of the Education Amendments of 1972*, 86 Fed. Reg. 27984-02, 27984 (May
25, 2021) ("*Bostock* Notice") (emphasis added).

Notwithstanding this clear threat of enforcement, the District Court concluded
that "HHS's consistent position has been that any enforcement would depend on the
particular facts of the action, including the nondiscriminatory reasons for refusing to
offer a specific service and the applicability of RFRA and other legal requirements."
*Am. Coll. of Pediatricians*, 2022 WL 17084365, at *16. This position, however, is
*not* a declaration that Appellees will not initiate enforcement actions against

9

Appellants. At best, it is noncommittal. At worst, it is a "veiled threat to . . . 'mess around and find out.'" *GPM Southeast LLC v. Riiser Fuels LLC*, No. 21-cv-554, 2022 WL 17821219, at \*19 (E.D. Wisc. Dec. 20, 2022); *see also Franciscan Alliance*, 47 F.4th at 376 ("In its brief on appeal, HHS simply says 'it has not to date evaluated' whether it will enforce Section 1557 against Franciscan Alliance—in other words, it concedes that it may.") (footnote omitted); *Religious Sisters of Mercy*, 55 F.4th at 605 (agreeing with the Fifth Circuit that "the government's assertion that 'it has not to date evaluated whether it will enforce Section 1557 against [the plaintiffs]' is actually a 'conce[ssion] that it may' do so." (quoting *Franciscan Alliance*, 47 F.4th at 376 (alterations in original)).

### A.     Appellants are Not Required to Break the Law and See What Happens to Establish Standing

Standing doctrine does not require plaintiffs to break, or even arguably break, the law before accessing the Court. It is axiomatic that "it is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see also F.E.C. v. Cruz*, 142 S. Ct. 1638, 1648 (2022) (observing that a principle that "would require the Committee to subject itself to the very framework it says unconstitutionally burdens its speech . . . finds no support in our standing jurisprudence"); *Driehaus*, 573 U.S. at 165

("[A]dministrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review.").

Accordingly, the Court's "analysis must begin with the recognition that, where threatened action by *government* is concerned, [the constitution does] not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 128-29 (2007) (emphasis in original). A government agency that is playing coy with its enforcement intentions—as Appellees have here—has practically refused to disavow enforcement and thereby at least tacitly threatened it.

**B.      Generic Assurances that Government Agencies Will Not Break the Law Are Not a Repudiation of an Intent to Enforce Against Specific Plaintiffs**

Generic assurances by a government agency that it will not break the law are not a repudiation of an intent to take enforcement action against a *specific* plaintiff. To hold otherwise is to give the generic statement a weight it cannot bear. The District Court committed this error here. First, the District Court accepted as true "Plaintiffs' allegations that they have nondiscriminatory scientific and medical concerns regarding the . . . practices [at issue] and that RFRA protects them from engaging in [those] practices." *Am. Coll. of Pediatricians*, 2022 WL 17084365, at *16. The District Court then concluded HHS's declaration that it will respect RFRA

can "hardly be construed as 'refusal to disavow enforcement.'" *Id.* This conclusion does not follow.

Government agencies rarely come into Court and say "yes, we know we have a statutory and constitutional duty not to do something. We intend to ignore that and do it anyway."[2] A bare-bones assertion by a government agency that it will not violate the law is not, and logically cannot, be sufficient to deprive standing to a plaintiff alleging the agency *will* violate the law, particularly where the agency's assertion is unaccompanied by an analysis applying the law to a plaintiff's specific facts. *See Religious Sisters of Mercy*, 55 F.4th at 606 (quoting *Franciscan Alliance*, 47 F.4th at 377 ("Although the government maintains that it 'will comply' with RFRA . . . its promise is 'so vague that the scope of liability [is] both unknown by the [government] and unknowable to [the plaintiffs],' who are 'within the 'class whose [conduct] is arguably restricted.'") (citations omitted). To hold otherwise is to assume a generic statement applies in every specific context. This cannot be correct.

---

[2] "If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary." James Madison, The Federalist No. 51 (Feb. 6, 1788). Appellees may be well intentioned, but they are no angels. Thus, there must be judicial controls on agency actions.

### C.    The District Court's Reliance on Appellees' RFRA Statements Disregards Appellants' Constitutional Claims

In addition, the District Court's reliance on Appellees' RFRA statements disregards the constitutional element of Appellants' claims.  As the Supreme Court has previously recognized, "[t]he Government may not render a ban on political speech constitutional by carving out a limited exemption through an amorphous regulatory interpretation." *Citizens United*, 558 U.S. at 324.  The same principle should apply to the exercise of other First Amendment rights, including the right to non-political free speech and the right to the free exercise of religion. Just as the government cannot hide behind "a limited exemption through an amorphous regulatory interpretation" to justify a law that restricts fundamental constitutional rights, it also should not be able to do so to deny Appellants' standing even to bring their case.

### D.    The District Court's Approach Would Eviscerate the Declaratory Judgment Act

The District Court's analysis would also functionally eviscerate the Declaratory Judgment Act, 28 U.S.C. § 2201.  "[T]he very purpose of the Declaratory Judgment Act" is to obviate the need for potential plaintiffs to choose between either complying with regulations that "purport to give an authoritative interpretation of a statutory provision that has a direct effect on [their] day-to-day business," on the one hand, or risking an enforcement action, on the other. *Abbott*

13

*Laboratories v. Gardner*, 387 U.S. 136, 152 (1967); *see also* Edwin Borchard, *Challenging 'Penal' Statutes by Declaratory Action*, 52 Yale L. J. 445, 445 (1943) ("One of the principal purposes of the declaratory judgment action is the removal of clouds from legal relations.").  As Professor Borchard noted nearly seventy years ago, "[p]ossibly in no branch of litigation is the declaration more useful than in the relations between the citizen and the administration" owing in part to "the growing complexity of government and the constantly increasing invasions of private liberty, with ever widening powers vested in administrative boards and officials, the occasions for conflict and dispute are rapidly augmenting in frequency and importance."  Borchard, *supra.*  These concerns have only become more acute with the passage of time and growth of the administrative state.

Under the District Court's reasoning, an agency could avoid an as-applied challenge to a statutory or regulatory interpretation that plainly impacts a plaintiff's conduct by simply declining to state a position on such conduct before initiating formal enforcement proceedings.  This is a road map to circumventing the text and purpose of the Declaratory Judgment Act in the realm where it is most needed.[3]

---

[3] Worse still, in many instances, plaintiffs would then confront statutory schemes and final agency action requirements that limit their ability to access the federal courts. *See, e.g., Axon Enterprise, Inc. v. F.T.C.*, 986 F.3d 1173, 1180 (9th Cir. 2021), *certiorari granted in part*, 142 S. Ct. 895 (2022) (holding that Federal Trade Commission Act stripped district courts of jurisdiction to review certain agency action); *Hill v. S.E.C.*, 825 F.3d 1236 (11th Cir. 2016) (same with respect to Securities and Exchange Act); *but see Cochran v. S.E.C.*, 969 F.3d 507 (5th Cir.

## IV.    There is a Citizen-Enforcement Provision for Section 1557

Contrary to the District Court's erroneous conclusion, there is a citizen-enforcement provision for Section 1557 that enhances the credible threat of an enforcement action.  *Am. Coll. of Pediatricians*, 2022 WL 17084365, at *15. Department regulations provide "[a]ny person who believes himself or any specific class of individuals to be subjected to discrimination prohibited by this part may by himself or by a representative file with the responsible Department official or his designee a written complaint."  45 C.F.R. § 80.7(b).

In some ways, the citizen-enforcement provision at issue in *Driehaus* provided *more* protections from frivolous complaints than the HHS regulations here. 573 U.S. at 151–53. Complaints under the Ohio statute at issue in *Driehaus* were required to be based on personal knowledge and submitted under penalty of perjury. *See* Ohio Rev. Code Ann. § 3517.153(A) (2019) (allowing complaints "made by affidavit of any person, on personal knowledge, and subject to the penalties for perjury"). By contrast, citizen complaints under the HHS regulations here require only a belief that a specific class of people is being discriminated against.  45 C.F.R. § 80.7(b).  Nevertheless, the Court in *Driehaus* reasoned that "[t]he credibility of that threat [of enforcement] is bolstered by the fact that authority to file a complaint

---

2020), *certiorari granted*, 142 S. Ct. 2707 (2022) (holding district court had jurisdiction to hear constitutional challenge to agency structure during pendency of administrative enforcement action).

with the Commission is not limited to a prosecutor or an agency," explaining that "[b]ecause the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations, there is a real risk of complaints from, for example, political opponents."  573 U.S. at 164.  These concerns are even more applicable here.

### A.  Standing Analysis Focuses on Citizen-*Initiated* Enforcement, Not Citizen-Driven *Prosecution* of Enforcement Actions

The District Court did not substantively engage with the citizen-enforcement provision in *Driehaus* and its impact or influence on the *McKay* factors.  Instead, the District Court shifted the focus away from citizen-complaint processes to focus on HHS's lengthy administrative-enforcement process.  *Am. Coll. of Pediatricians*, 2022 WL 17084365, at *15.  This analysis misses the significance of the Department's citizen-initiated enforcement process.

Both the Supreme Court in *Driehaus* and this Court in subsequent cases such as *McKay* and *Fisher* focus on citizen-initiated *complaint* processes.  Neither Court requires that citizens must actually *prosecute* their complaint to enhance the threat of enforcement.  To wit, *Driehaus* concerned a statutory scheme under which any person could file a complaint.  Regardless of who filed the complaint, the Ohio Election Commission was charged with investigating and taking appropriate action in response to it.  *See* Ohio Rev. Code Ann. §§ 3517.154–57 (2019).

Likewise, *McKay* referred to attributes that make enforcement easier or more likely "such as a provision allowing any member of the public *to initiate an enforcement action*." 823 F.3d at 869 (emphasis added).

And *Fischer* concluded that the Judicial Code of Kentucky "contain[ed] a feature making enforcement 'easier or more likely'—namely, a provision authorizing any member of the public to file complaints" even though "in approximately 92% of cases, the Commission disposes of the complaint without ever notifying the judge or candidate" that it was filed, let alone subjecting them to a lengthy administrative enforcement action. 52 F.4th at 308 (citations omitted).

Based on these cases, the *sine qua non* of a citizen-enforcement provision for purposes of assessing standing is a citizen-*initiated* complaint process, not a citizen-driven *prosecution* process.

## B.    A Lengthy Administrative Enforcement Process is a Harm, Not a Benefit

The District Court inverted the standing analysis by viewing the Department's lengthy enforcement process as a benefit rather than a harm. *Am. Coll. of Pediatricians*, 2022 WL 17084365, at *16 n.5. But when it comes to administrative enforcement proceedings, the process itself often is the punishment.

First, even when regulated persons are successful, administrative enforcement proceedings are expensive. As this Court recognized in *Fischer*, even an "informal investigation" can "force [respondents] to divert significant time and resources to

17

hire legal counsel and respond to discovery requests." *Fischer*, 52 F.4th at 309

(quoting *Driehaus*, 573 U.S. at 165).

Second, even the mere filing of a complaint can cause lasting reputational

harm.  This is particularly true where, as here, the charges would likely include

inflammatory accusations of bigotry.  Once those charges are leveled, they can be

hard to walk back, even if a respondent is ultimately vindicated through the

administrative enforcement process.  As the old maxim goes, "a lie can travel

halfway around the world while the truth is still putting on its shoes." Or as former

Labor Secretary Raymond Donovan put it more bluntly for those accused of

misconduct, "Which office do I go to to get my reputation back?"  Joseph P. Fried,

*Raymond Donovan, 90, Dies; Labor Secretary Quit Under a Cloud*, N.Y. Times

(June  5,  2021),  https://www.nytimes.com/2021/06/05/us/raymond-j-donovan-

dead.html.

### C.    **Administrative Agencies are the Wrong Forum for Adjudicating Constitutional Rights**

Administrative agencies are the wrong forum for adjudicating constitutional

rights.[4]  As Justice Thomas has observed, the division of authority in Articles I, II

and III of the United States Constitution does not "vest the Federal Government with

---

[4] *See generally* Brief of Citizens United and Citizens United Foundation as *Amici Curiae* in Support of Respondent at 7–9, *S.E.C. v. Cochran*, Docket No. 21-1239 (U.S. July 7, 2022) (arguing that executive branch agencies cannot exercise the judicial power of the United States).

an undifferentiated 'government power;'" rather, "the Constitution identifies three types of governmental power and, in the Vesting Clauses, commits them to three branches of Government." *Dep't of Transp. v. Ass'n. of Am. R.Rs.*, 575 U.S. 43, 67 (2015) (Thomas, J., concurring in judgment). While the executive branch should be cognizant of constitutional and statutory rights when exercising its authority, adjudication is a classic exercise of judicial power.

"[T]he separation of powers is designed to preserve the liberty of all the people." *Collins v. Yellen*, 141 S. Ct. 1761, 1780 (2021) (citations omitted). In The Federalist No. 47, Madison quoted Montesquieu's warning "'[t]here can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates,' or, 'if the power of judging be not separated from the legislative and executive powers,'" and that "'[w]ere the power of judging joined with . . . the executive power, THE JUDGE might behave with all the violence of AN OPPRESSOR.'" James Madison, The Federalist No. 47 (Feb. 1, 1788). It follows that "[i]n establishing the system of divided power in the Constitution, the Framers considered it essential that 'the judiciary remain[] truly distinct from both the legislature and the executive." *Stern v. Marshall*, 564 U.S. 462, 483 (2011) (quoting Alexander Hamilton, The Federalist No. 78 (May 28, 1788) (alteration in original)).

While the precise line between "judicial" and "executive" power is blurry, particularly following the growth of the administrative state, it is still "emphatically the province and duty of the judicial department to say what the law is." *Marbury*, 1 Cranch at 177. "The rise of the modern administrative state has not changed that duty." *City of Arlington*, 569 U.S. at 316 (Roberts, C.J., dissenting).

Against this backdrop, the District Court's determination that a plaintiff can still raise statutory and constitutional defenses before an administrative agency in an enforcement proceeding does not justify denying standing. The permissibility of administrative adjudication is premised in part on the notion that administrative agencies are serving as fact-finding bodies. *See N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 81 (1982) ("Art. III does not require 'all determinations of fact [to] be made by judges,' . . . with respect to congressionally created rights, some factual determinations may be made by a specialized factfinding tribunal designed by Congress, without constitutional bar.") (quoting *Crowell v. Benson*, 285 U.S. 22, 54 (1932) (alteration in original)). While the fact that the agency is dealing with the allocation of federal funds rather than a dispute over purely private rights complicates the analysis, the judiciary is still the branch best suited to adjudicate questions of constitutional law. Accordingly, the potential for the agency to opine on such questions, which are outside its area of expertise, supports a holding that would grant Appellants their day in *court*.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be reversed and this case should be remanded for further proceedings.

Dated April 6, 2023

Respectfully submitted,

*/s/Gary M. Lawkowski*
GARY M. LAWKOWSKI
Bar No. 1207310
Dhillon Law Group, Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: 703-574-1654
GLawkowski@DhillonLaw.com

*Counsel for amicus curiae Center for American Liberty*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), contains 4,677 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: April 6, 2023

*/s/Gary M. Lawkowski*
Gary M. Lawkowski
One of the Attorneys for *Amicus Curiae*
*Center for American Liberty*

22

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 6, 2023, an electronic copy of the Brief of the Center for American Liberty as *Amicus Curiae* in Support of Plaintiffs-Appellants was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. The undersigned also certifies that all participants are registered CM/ECF users and will be served via the CM/ECF system.


*/s/Gary M. Lawkowski*
Gary M. Lawkowski